I,THOMAS F. DALEY, Judge.
The defendant, Christopher Moore, has appealed the trial court’s judgment awarding spousal support. For the reasons that follow, we affirm.
*912 FACTS:
Plaintiff, Rachel Uhl Moore (Rachel), and Christopher Moore (Christopher) were married'on August 12, 1995 in Louisiana. The couple established a matrimonial domicile in the United Kingdom, Mr. Moore’s native country, shortly after the marriage. The couple’s only child, Lucy, was born on March- 8, 2001. On September 19, 2001, Rachel moved back to Louisiana. Christopher came to Louisiana on December 17, 2001 and returned to the United Kingdom on December 30, 2001. On January 9, 2002, Rachel filed a Petition for Divorce alleging that she was free of fault in the breakup of the marriage and that Christopher had abandoned her. She also sought spousal support. Following a hearing on Api’il 3, 2002, Rachel was. awarded $700.00 per month interim spousal support. A judgment granting divorce was rendered on October 9, 2002. On ^February 19, 2003, a hearing was held to determine fault and permanent spousal support. At the conclusion of the hearing, the trial.judge took the matter under advisement. He then rendered judgment, without reasons, finding Rachel free from fault in the breakup of the marriage and awarding her permanent periodic spousal support in the amount of $700.00 per month. Christopher has appealed claiming the trial judge erred in finding Rachel was free from fault and entitled to support, and that the amount of support awarded is excessive.
FAULT:
Rachel testified that when she and Christopher married, they agreed to live in the United Kingdom for five years and then live in the United States. She testified that shortly after their marriage, they purchased a house in England.
Throughout the marriage, Christopher played soccer. Rachel testified that he played soccer every Saturday and he practiced or played soccer on Tuesdays and Thursdays. She explained that he frequently went to pubs after the games and came home intoxicated. Rachel testified that she went to many soccer games prior to the birth of their daughter, however, she only went to one game after the birth.
Rachel testified that she came to Louisiana- in September 2001 and expected Christopher to come shortly thereafter. She and Lucy moved into an apartment owned by her grandmother. Christopher came to visit for several days in October 2001. They spoke on the phone, but by December 2001, Rachel testified that Christopher was not talking to her because she “put too much pressure on him to come to the United States and he wasn’t ready.” She testified that several of her phone calls to Christopher went unanswered.
Rachel testified Christopher arrived on December 17, 2001 with a round trip ticket. She explained that Christopher told hér that he had fallen out of love with her and that they were mismatched. He complained that their sexual relationship Rwas not “up to par”, that she did not iron his clothes, take an interest in his work, or attend his soccer games. . Rachel testified that these revelations took her by complete surprise. She explained that she had always listened to Christopher talk about his work, that he never said he was unhappy, and had never complained about their sexual relationship. Rachel testified that she asked Christopher to go to a family friend who was a psychologist for marital counseling, but Christopher refused. Rachel explained that when Christopher left, she lost her best friend, her husband, and the father of her child and was devastated. At the time of the hearing, she was still unsure of exactly why he abandoned her.
•On cross-examination, Rachel denied giving Christopher an ultimatum stating *913 that she was coming to the United States with or without him.
Rachel’s parents took the stand and testified that it always appeared that the couple had a happy marriage. Both Mr. and Mrs. Uhl testified that they spoke to Christopher before he left to go back to the United Kingdom, and begged him to stay in the United States to work on his marriage. Mrs. Uhl testified that she called Christopher’s mother to ask for help, but was told there was nothing she could do. When Mrs. Uhl suggested to Christopher that Rachel return to England with him, Christopher responded that he did not want to be married to Rachel any more. Mr. Uhl testified that he told Christopher on numerous occasions that he could help to get him a job in the family business.
Christopher testified that although he voiced concerns about moving to the United States, he did follow through on his commitment to do so. He explained that when Rachel told him that she was leaving with or without him, he began making plans to move. He explained that he knew that he would not be able to work in the same profession when he came to the United States because the laws and financial markets were different. He explained that he attended training to become a soccer coach so he could pursue such employment in Louisiana. He |5explained that when the couple shipped their belongings to Louisiana, he left behind a bedroom set because he moved in with his brother and he needed a place to sleep. Christopher explained that the cost to ship the bedroom set to the United States exceeded the value of the furniture.
Christopher testified that he was very frustrated by the infrequent sexual relations between him and Rachel. He stated that the sexual problems began at the end of 1997. He testified that he spoke to Rachel about this, but the problem remained unresolved.
Christopher testified that he came to Louisiana in October 2001 and stayed with Rachel in her grandmother’s apartment. He testified that he had difficulty sleeping because of a street light shining in through the bedroom window and that he asked Rachel to obtain curtains to block this light. He explained that when he returned, there were no curtains and that this was just an example of Rachel’s selfishness. He further expressed his displeasure at Rachel hiring a maid to clean the small apartment, when neither of them had jobs. They did not have a maid in England. Christopher denied that he told Rachel he no longer loved her. Rather, he explained that his love was not strong enough to keep the marriage together. Christopher explained his disappointment when he arrived in December 2001 and his mother-in-law, rather than his wife and daughter met him at the airport. He was further disappointed when he arrived at the apartment and Lucy was already asleep for the night.
Christopher testified that he played semi-professional soccer 40 weeks per year. He stated that he and Rachel argued frequently in the last year about his soccer. He explained that he worked from home and the couple took numerous trips, so he did not think soccer interfered in the relationship. Christopher explained that he did not want to go to the counselor as suggested by Rachel | (¡because the man was a family friend. Christopher did not deny that Rachel suggested returning to England with him, he simply stated “she didn’t.”
Christopher denied that he did not intend to remain in the United States when he arrived in December 2001. Rather, he explained that he quit his job, sold his house, and retrained for a soccer coaching *914 job in the United States. He explained that he had blood tests and immunizations and obtained a visa as required to live in the United States. He further explained that he purchased a round trip ticket in December 2001 because it was less expensive than a one way ticket. Christopher testified that he came to the United States to work on a bad marriage. He hoped things would improve when he got here, but they got worse. He explained that on December 29, 2001 he became aware that Rachel had withdrawn $12,000.00 in funds from the only United States bank account that he had access to. He confronted Rachel about this, and told her that he did not love her and was leaving. He testified that she initially told him that she would move in with her parents and he could stay in the apartment. She then told him to get a hotel room. Christopher testified that he spent the night of December 29, 2001 in a hotel room.
Based on the testimony of the parties, Rachel Moore’s parents, and several of the couple’s friends, the trial judge determined that Rachel Moore was free from fault. Civil Code article 111 provides that a court may award final periodic support to a party free from fault prior to the filing of a proceeding to terminate the marriage. The trial court is vested with vast discretion in determination of fault for the purposes of determining final support because this issue turns largely on evaluations of witness credibility. Goodnight v. Goodnight, 98-1892 (La.App. 3 Cir. 5/5/99), 735 So.2d 809. The trial court’s finding of fault will not be disturbed in .the absence of manifest error. Jones v. Jones, 35,502 (La.App. 2 Cir. 12/5/01), 804 So.2d 161.
17Rachel testified that the couple made plans to move to Louisiana in the fall of 2001. She proceeded with these plans, arriving in Louisiana with her, infant daughter in September 2001. She explained that when her husband arrived in December 2001, he told her he had fallen out of love with her and did not want to be married to her any longer. Rachel’s parents also testified that Christopher stated that he no longer wanted to be married to Rachel. Although Christopher denied that he told Rachel he no longer loved her on the night he arrived, he later testified that after he became aware that she had withdrawn money from a joint bank account, he told her he no longer loved her and he was leaving. He did not dispute that Rachel offered to accompany him back to England; rather, he merely stated that she did not go. While it is apparent from the testimony that there were problems in the marriage, the testimony supports the trial court’s finding that Rachel was free of fault in the breakup of the marriage for the purposes of support under Civil Code article 111. A spouse is not deprived of permanent support because he or she was not totally blameless in the marital discord. Goodnight, supra. We find that the testimony of Christopher that he told Rachel that he no longer loved her and was leaving, accompanied by Rachel’s parents testimony that they asked Christopher to stay and he stated that he no longer wanted to be married to Rachel, coupled with Christopher’s statement that he did not want Rachel to return to England to live with him, is sufficient evidence to support the trial judge’s finding that Rachel was free from fault in the breakup of the marriage. We now turn to the issue of support.
SUPPORT:
During the marriage, Rachel worked as a computer hardware and software purchaser for Polygram Records. She left this employment in March 2000 after having a miscarriage. Rachel testified that she is currently unemployed in *915 order to 1 Rbe a stay-at-home mother. However, she acknowledged that Lucy spends 20 hours per week in day care.
Rachel testified that when she came to Louisiana, she moved into an apartment owned by her grandmother. She testified that she paid her grandmother $500.00 per month rent plus $270.00 in utilities. She explained that her parents had loaned her money to purchase a car and she had to pay them back at a cost of $361.00 per month. Although Rachel has an undergraduate degree in psychology and a master’s degree in business management, she is currently attending UNO in an attempt to obtain another degree. At the time of the hearing, she was taking one class in anthropology. While Rachel acknowledged the cost of tuition was $625.00 per semester, she claimed taking this one class actually cost $250.00 per month because she needed a babysitter, and had to pay for books and parking. She explained that she would be able to obtain this degree in two years and that it would help her get a good job. Her other expenses included $200.00 per month for clothes, $55.00 for laundry and cleaning, $95.00 per month for personal grooming (haircuts, toiletries, makeup), $120.00 per month for car insurance, and $100.00 per month for recreation, and $50.00 per month for gifts and donations. Rachel submitted a financial statement indicating her monthly expenses to be $2,846.00. The income portion of the financial statement was blank. Rachel testified that she had transferred $25,000.00 from her savings account to cover these expenses.
In England, Christopher worked for a company selling pension plans. Rachel testified that Christopher earned about $100,000.00 in this position. Rachel was unaware of Christopher’s income at the time of the hearing. She only knew that he worked as a financial advisor for one of his old clients. She explained that in the United Kingdom a tax return is only filed if a person is self employed. She and her family testified that he was paid in cash for playing soccer. Rachel explained that he received $300.00 per week cash for playing soccer and that the couple used this | nmoney for groceries and entertainment. She denied that he had any soccer related expenses.
Christopher denied that he earned $100,000.00 at his prior job. He stated that he made $60,000.00 during the last year that he and Rachel lived together. He testified that he currently has a monthly net income of $1,700.00. He explained that he could not go back to his former job because after September 11, 2001, the financial markets in the United Kingdom were down and his former employer was not hiring. He testified that he had recently purchased an apartment in England for $169,500.00. He explained that in England he did not have to fill out a loan application in order to obtain a loan to make this purchase. Rather, the fact that he had a previous mortgage for six years and good credit history qualified him for this loan. He acknowledged having recently purchased a $10,000.00 car. Christopher acknowledged receiving cash for playing soccer, but explained that this money was used to pay transportation and expenses related to playing soccer.
Christopher was questioned regarding numerous transfers into and out of his checking account. He explained that this was due to various investments maturing and cashing out and then making different reinvestments.
Both parties testified that they obtained approximately $90,000.00 when the parties divorced. Christopher testified that this amount had been reduced to about 40,000 pounds in order to pay his expenses. Rachel testified that her portion of the money she obtained when the couple’s assets were divided remained in an account collecting *916 interest. She testified that the interest earned is reinvested every month. She later testified that she had taken $25,000.00 from her savings account and put it in her checking account in order to cover expenses.
A spouse claiming support is required to deplete her liquid assets to some extent before she may be entitled to post-divorce support. Patton v. Patton, 37,401 (La.App. 2 Cir. 9/24/03), 856 So.2d 56. In determining the extent of any depletion Imof assets, the court must apply a “rule of reasonableness” in light of factors such as ages and health of the parties and their ability, education, and work experience. Id. The court must be cautious of the long term effects when contemplating depletion of assets in determining the amount of support that is proper. Id.
The testimony revealed that both parties in this case have a significant amount of cash in the bank. It is apparent from the testimony that Rachel’s family has assisted her financially upon her return to Louisiana. Rachel testified that she pays rent to her grandmother as well as the utilities for the apartment. However, the record contains no cancelled checks or receipts for such payments. Additionally, Rachel testified that she is attending school at night rather than during the day. There was no testimony as to why Rachel could not attend school during the hours that Lucy is at day care. Rachel testified that part of her expenses included health insurance for herself and that Lucy was on Medicaid. Apparently the trial judge found that Rachel’s transfer of $25,000.00 from her savings account to her checking account to cover expenses was sufficient depletion of her assets to warrant final support. Additionally, it is apparent that Rachel may need these funds for future expenses since she does not plan to get a job for another two years. In light of the fact that Rachel has not held a job for several years and has a young child, we find no abuse in the trial court’s decision to award support. We now turn to the amount of support.
Rachel was awarded $700.00 in interim support and the trial judge awarded the same amount in permanent support. The transcript on the hearing on interim support was not included in the record on appeal.
Christopher’s testimony regarding his income and expenses was difficult to follow. Some of the figures were quoted in the United Kingdom currency, pounds sterling, while other amounts were quoted in United States dollars. Christopher prepared an income and expense statement that was admitted into evidence. This |^statement corroborates his testimony that his net monthly income at the time of the hearing was $1,700.00. However, the record does not contain one document to support his earnings in this amount. Curiously, child support and interim spousal support were not included in the list of expenses. When questioned as to how he could obtain a loan sufficient to cover 95% of the costs of a $169,500.00 apartment, he stated that it was only required that he show that he had a previous mortgage for six years and that he had a good credit rating. Christopher was an experienced financial planner. It would seem that he would have been able to prepare some type of documentation to support the amount he claimed regarding income and expenses. Additionally, Christopher acknowledged receiving $300.00 per week cash for playing soccer.
In determining the amount of final periodic support, Civil Code article 112 lists several factors to be considered by the court including the needs and income of the parties and the earning capacity of the parties. This article provides that the award of final periodic support shall not exceed one-third of the payor spouse’s net income.
*917 We find that the $700.00 per month in permanent spousal support is not an abuse of discretion. While Rachel testified that her monthly expenses exceed this amount, we note that she is receiving $480.00 per month in child support and earns approximately $800.00 per month on her investments. Rachel claims expenses in excess of $2,800.00 per month, but all of these expenses, especially the tuition expense, were not supported by the record. Additionally, although Rachel has a young child, the child spends 20 hours per week in day care and Rachel, who has a master’s degree in business management, chooses to remain unemployed. Christopher has a significant earning capacity. In addition to his experience as a financial planner, he now has worldwide certification as a soccer coach. Christopher makes the assertion that the $700.00 per month award exceeds onejthird12 of his net income. We find the record unclear as to Christopher’s exact net income. There was enough testimony to establish that Christopher receives $1,700.00 per monthly salary plus an additional $300.00 per week for playing soccer and that he has substantially larger earning capacity. We, therefore, affirm the $700.00 award of spousal support. We note, however, that this support award is subject to modification upon a change in circumstances. Changes that would certainly affect the award are the couple’s child reaching five years old or Rachel becoming employed. When either of those events occurs, Christopher will be entitled to have the support award reviewed for possible reduction.
CONCLUSION:
For the foregoing reasons the judgment of the trial court is affirmed.

AFFIRMED.